**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

ALLAN JOSUE MARTINEZ MARTINEZ,

*Petitioner-Plaintiff*,

v.

MARKWAYNE MULLIN, in his official capacity as Secretary of the U.S. Department of Homeland Security, TODD BLANCHE, in his official capacity as Acting Attorney General of the United States, TODD LYONS, in his official capacity as Director of the U.S. Immigration and Customs Enforcement, WILLIAM JOYCE, in his official capacity as Acting New York Field Office Director for U.S. Immigration and Customs Enforcement; JOSEPH B. EDLOW, in his official capacity as Director of U.S. Citizenship and Immigration Services; ROBERT F. KENNEDY, JR. in his official capacity as Secretary of Health and Human Services; ANGIE SALAZAR, in her official capacity as Acting Director of the Office of Refugee Resettlement; U.S. Department of Homeland Security; U.S. Immigration and Customs Enforcement; U.S. Department of Health and Human Services; U.S. Office of Refugee Resettlement; U.S. Department of Citizenship and Immigration Services.

*Respondents-Defendants*.

Case No. 26-cv-02858

**AMENDED VERIFIED EMERGENCY PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT**

## I. INTRODUCTION

1. This case is about an 18-year-old young man with Special Immigrant Juvenile Status (SIJS) who cannot be removed from the United States because he has a valid grant of Deferred Action connected to his SIJS. Nevertheless, Respondents abruptly detained him—

transferring him to ICE custody on his 18th birthday—in contravention of federal law and the Constitution.

2. Allan Josue Martinez Martinez ("Petitioner" or "Allan") is an 18-year-old from Fort Worth, Texas who graduated from Everman Academy High School in Everman, Texas, a year early in May of 2025.

3. Allan is now unlawfully detained in physical custody of Respondents at the Metropolitan Detention Center (MDC) in Brooklyn, New York, an adult criminal correction facility known for its abusive conditions that is not safe or appropriate for a teenager. Allan is scared and was visibly distressed and crying during a legal meeting on April 13, 2026.

4. Allan came to the United States from Honduras when he was 8 years old, because Honduras was not a safe place for him. On or around October 30, 2016, Allan was placed in the custody of Office of Refugee Resettlement (ORR) as an unaccompanied child (UC). He was then released to his approved sponsor, his mother, on November 11, 2016.

5. In 2019, after a Texas district court determined that it was not in Allan's best interest to return to Honduras, U.S. Citizenship and Immigration Services ("USCIS") approved Allan's petition for SIJS. SIJS is a humanitarian immigration protection enshrined in federal statute that is designed to afford certain immigrant children who have suffered parental abuse, neglect, abandonment, or similar mistreatment the opportunity to remain safely and permanently in the United States.

6. However, because of a visa backlog, young people with SIJS must wait—often years—before they are able to apply for a green card and gain lawful permanent resident ("LPR") status. Under a USCIS policy designed to protect these vulnerable youth during this wait, on November 3, 2022, Allan also received a four-year, renewable grant of deferred action and

accompanying employment authorization. This allowed him to attend school, work legally, and build a stable life here in the United States without the threat of deportation while he waits to apply for a green card.

7. After an unlawful arrest as a minor—an arrest based on racial profiling, and where charges were never filed—Allan was re-detained and placed in ORR custody in August 2025. He remained detained in ORR and separated from his family for over seven months, despite having an available sponsor (his mother), who had been previously approved as his sponsor.

8. On his 18th birthday, despite a Best Interests Determination from his Child Advocate at The Young Center recommending release to his mother (*see* Ex. D), despite an approved Special Immigrant Juvenile visa with a current priority date and related deferred action (*see* Ex A), and despite multiple assurances that he would be released (*see* Ex. C), Allan was wrongfully transferred from ORR to adult ICE custody.

9. Through his grant of SIJS, Allan is currently eligible to adjust his status to a lawful permanent resident, which he must remain in the United States to access. Respondents' efforts to block Allan from accessing the protections Congress specifically enacted for the benefit of youth like him improperly subverts Congress' intention that he be permitted to adjust status and establish a stable life in the United States.

10. Allan's arrest and ongoing detention violate his constitutional rights. Because Allan cannot be removed from the United States, his ongoing detention—particularly without any individualized review—serves no lawful purpose and runs afoul of the substantive and procedural due process protections of the Fifth Amendment.

11. Allan respectfully asks this Court to hold that his continued detention is unlawful and order his immediate release from custody, or in the alternative, hold a bond hearing.

## PARTIES

12. Petitioner-Plaintiff Allan is an 18-year-old high school graduate who came to the United States from Honduras at the age of 8 and settled in Fort Worth, Texas. He has an approved SIJS petition and deferred action and is immediately eligible to adjust to lawful permanent resident status. On April 7, 2026, ICE arrested Allan even though he was supposed to be released on recognizance from ORR. Allan is now detained at the MDC in Brooklyn, New York. When the petition was initially filed, he was detained at 26 Federal Plaza, New York, New York.

13. Respondent Markwayne Mullin is named in his official capacity as the Secretary of the U.S. Department of Homeland Security. In this capacity, he is responsible for overseeing ICE's day-to-day operations, leading approximately 20,000 ICE employees, including Respondent Lyons. Secretary Mullin is the ultimate legal custodian of Allan.

14. Respondent Todd Blanche is the Acting Attorney General of the United States. As Acting Attorney General, Respondent Blanche oversees the immigration court system, including the immigration judges who conduct bond hearings as his designees, and is responsible for the administration of immigration law pursuant to 8 U.S.C. § 1103(g). He is legally responsible for administering Allan's removal and bond proceedings, including the standards used in those proceedings, and as such, he is Allan's legal custodian. He is sued in his official capacity.

15. Respondent Todd Lyons is sued in his official capacity as Acting Director of ICE. As Acting Director of ICE, Respondent Lyons is the legal custodian of Allan.

16. Respondent William Joyce is named in his official capacity as the acting New York Field Officer Director for U.S. Immigration and Customs Enforcement within the United States Department of Homeland Security ("DHS"). In this capacity, he is responsible for the administration of immigration laws and the execution of detention and removal determinations, and is the legal custodian of Allan.

17. Respondent Joseph B. Edlow is named in his official capacity as Director of U.S. Citizenship and Immigration Services. In this capacity, he is responsible for administering and overseeing the program for SIJS classification and deferred action.

18. Respondent Robert F. Kennedy, Jr. is the Secretary of Health and Human Services ("HHS"). In this capacity, he ultimately oversees the Office of Refugee Resettlement ("ORR"), a sub-component of HHS, that is responsible for the care of unaccompanied minors.

19. Respondent Angie Salazar is named in her official capacity as Acting Director of the Office of Refugee Resettlement. In this capacity, she oversees the staff of ORR who are responsible for the care of unaccompanied immigrant children.

20. Respondent U.S. Department of Homeland Security ("DHS") is an executive department of the United States Government headquartered in Washington, D.C. DHS is the parent agency of Immigration and Customs Enforcement and U.S. Citizenship and Immigration Services.

21. Respondent U.S. Immigration and Customs Enforcement ("ICE") is a component agency of DHS and is responsible for enforcing federal immigration law, including the detention and removal of immigrants.

22. Respondent U.S. Department of Health and Human Services ("HHS") is an executive department of the United States Government headquartered in Washington, D.C. HHS is the parent agency of the Office of Refugee Resettlement.

23. Respondent Office of Refugee Resettlement ("ORR") is a component agency of HHS and is responsible for the care, custody, and wellbeing of unaccompanied immigrant children.

24. Respondent U.S. Citizenship and Immigration Services ("USCIS") is a component agency of DHS and is responsible for administering and overseeing the program for SIJ classification and deferred action.

**JURISDICTION AND VENUE**

25. This Court has subject matter jurisdiction under 28 U.S.C. § 2241 (habeas corpus); Art. I § 9, cl. 2 of the U.S. Constitution (Suspension Clause), 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § (All Writs Act), and 5 U.S.C. § 701 (the Administrative Procedure Act). This Court has additional remedial authority under 28 U.S.C. §§ 2201-02 (the Declaratory Judgment Act) to grant injunctive and declaratory relief.

26. Federal district courts have jurisdiction to hear habeas claims brought by noncitizens challenging the lawfulness of their detention. *See Demore v. Kim*, 538 U.S. 510, 516-17 (2003) (recognizing habeas jurisdiction over immigration detention challenges); *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001) (same).

27. Venue is proper in this District under 28 U.S.C. §§ 1391(b) and (e)(1) because Allan was detained within the Southern District of New York when this petition was filed, his immediate physical custodian was located within this District, and a substantial part of the events giving rise to this petition occurred and continue to occur within this District.

**FACTUAL ALLEGATIONS AND PROCEDURAL HISTORY**

28. Allan was born in Honduras on April 7, 2008. As a child in Honduras, Allan suffered neglect and abandonment at the hands of his father.

29. Allan came to the United States in 2016, when he was 8 years old, settling in Fort Worth, Texas with his mother and two brothers. His mother immediately enrolled him in school, where he began to learn English, which he now speaks and reads with full fluency. In 2025, Allan graduated from Everman Academy High School in Texas.

30. In 2019, the Tarrant County District Court in Tarrant County found that Allan had been abandoned and neglected by his father. The District Court also found that it was in Allan's best interests to remain in the United States because there would be no one with whom he could

safely live in Honduras and because of violence in the country. The court granted conservatorship (possession, custody and control of the child) to his mother. Based on these state findings, Allan applied for SIJS with USCIS.[1]

31. On November 4, 2019, USCIS granted Allan's petition for SIJS and on May 12, 2022, granted Allan deferred action. Allan received an Amended I-797C Notice of Action, which stated: "USCIS has determined that you warrant a favorable exercise of discretion to receive deferred action. As a result, you have been placed in deferred action and you may be issued an employment authorization document." *See* Ex. A, I-797C Notice of Action. The notice also stated: "Your grant of deferred action will remain in effect for a period of four years from the date of this notice unless terminated earlier by USCIS." *Id.* Therefore, Allan's deferred action does not expire until May 12, 2026.

32. Based on his grant of deferred action, Allan was granted employment authorization on August 23, 2023.

33. Because of the visa backlog impacting SIJS beneficiaries, Allan could not immediately apply to adjust his status to become an LPR after being approved for SIJS and instead was required to wait until a visa became available to him. While waiting for his opportunity to adjust status, Allan made plans for his future based on his grant of SIJS, his deferred action, and his ability to work lawfully.

34. Allan always understood how important education would be to his ability to achieve his dreams. In 2025, Allan graduated from Everman Academy High School, one year earlier than his expected graduation date. Allan's dream is to be an HVAC technician and he has

---

[1] USCIS is the sub-agency of the Department of Homeland Security with exclusive jurisdiction over SIJS petitions, including both granting and revoking SIJ status. See 8 C.F.R. §§ 204.11(d); 205.2. Other DHS sub-agencies, such as ICE and Customs and Border Patrol, can neither grant nor revoke SIJS. *Id.*

been diligently self-studying with the goal of enrolling in trade school upon his return to Texas.

35. Prior to his unlawful re-detention, Allan lived with his mother and two brothers. Allan's family depends on him for emotional and familial support.

36. While Allan was arrested twice as a juvenile, neither arrest should impact his ongoing unlawful detention. Allan was arrested on August 24, 2024, in Forest Hills, Texas and faced juvenile court allegations of evading arrest, unauthorized use of a vehicle, resisting arrest, and collisions involving damage to a vehicle. Allan was only 16 years old at the time, and this was his first arrest. He was placed in a level 1 (low-level) juvenile detention center and was released after about three weeks for good behavior. Allan was then placed on probation, which he completed without any issues. On April 3, 2025, Allan's case was dismissed before the 323RD Judicial District Court in Tarrant County, Texas.

37. Upon information and belief, on July 27, 2025, Allan was arrested in violation of his fourth and fifth amendment rights under the alleged grounds of aggravated assault with a deadly weapon by the Fort Worth PD in Tarrant County, Texas. *See* Ex. D, Best Interests Determination by the Young Center for Immigrant Rights. No charges were filed against him, and he maintains that his arrest was the result of racial profiling.

38. The Tarrant County Criminal District Attorney's Office confirmed on February 2, 2026 that there were no charges ever filed against Allan. Furthermore, a search of the Tarrant County District Clerk data yielded no records of felony criminal convictions for Allan.

39. Despite the fact that no charges were filed against him, Allan spent about a month in county jail. Upon information and belief, on or about August 26, 2025, Allan was told that he was to be released from county jail back to the custody of his mother; instead, ICE arrested and detained him without notice, moving him to ORR custody in New York State. He spent over seven

months detained by ORR. During that time, no neutral arbiter assessed whether his detention was proper.

40. According to ORR records, Allan displayed no inappropriate behavior and was not a flight risk. Further, while he was initially admitted to Staff Secure detention at Children's Village, he was subsequently stepped down to shelter status within his initial month, due to his good conduct. In his discharge summary prior to his transfer to Abbott House, his Case Manager at Children's Village stated that Allan "exhibited positive behavior, followed program rules, and engaged well with all peers and staff."

41. Upon information and belief, Allan was supposed to be "released on recognizance" to his mother in Texas after aging out of ORR detention, per the recommendation of administrators at Abbott House, the ORR facility where he was detained immediately prior to his 18th birthday. *See* Ex. C, Declaration of Jocabed Rosario.

42. Allan's appointed Child Advocate from the Young Center also supported his release, finding that he was not a danger to himself, the community or a flight risk, and therefore it was in his best interest to be released on his own recognizance to his mother. *See* Ex. D, Best Interests Determination from the Young Center.

43. Further, the Field Office Juvenile Coordinator (FOJC) responsible for overseeing Allan's release from ORR also approved recommendations from Abbott House and the Young Center to facilitate his reunification with his mother upon turning 18. *See* Ex. C.

44. However, instead of proceeding as planned with his release on recognizance, on April 7, 2026, Allan was detained by ICE, and brought to 26 Federal Plaza, where he spent a sleepless night in a holding cell, frightened and upset, because he had thought he would be reunited with his mother in Texas. He was detained at 26 Federal Plaza upon the filing of this initial petition.

45. Allan is now detained at MDC Brooklyn. MDC Brooklyn, an adult jail described as "hell on earth,"[2] is notorious for its poor conditions, abuse of detainees, and violence. At only 18 years old, Allan is one of the youngest detainees to be held at this adult criminal correctional facility. Allan has described feeling depressed, anxious and scared in detention, and was tearful throughout a legal meeting on April 13, 2026. He wears a jumpsuit and is surrounded by much older men and wants nothing more than to be released to his mother as planned.

## LEGAL FRAMEWORK

### Legal Framework and Policies Governing Custody and Release of Immigrant Children

46. Each year, thousands of children flee violence, persecution, and abuse in their home countries, and seek protection in the United States. Many of these children come from countries where gang violence, government corruption, and instability create conditions that make these regions among the most dangerous for children. According to the United Nations, nearly two-thirds of immigrant children from these regions have experienced harms that qualify them for international refugee protection. Federal law recognizes that minors are distinctively vulnerable and establishes a child-welfare framework, not a carceral one, to govern their custody and release.

47. In the 1980s and 1990s, immigrant children who arrived to the United States were routinely locked up for months in unsafe and unsanitary jail cells, in remote facilities across the country. These conditions prompted a federal lawsuit, *Flores v. Reno*, which resulted in a 1997 consent decree that set national standards for the detention, release, and treatment of immigrants in government custody. In addition to setting certain minimal detention standards, *Flores* guarantees that children shall be released "without unnecessary delay" and requires the

[2] *See* María Santana, *Venezuela's Maduro Has Been in a Notorious Brooklyn Jail for Over 80 Days. This is What Life Is Like in There,* CNN (Mar. 25, 2026), https://www.cnn.com/2026/03/25/americas/venezuela-maduro-jail-conditions-mdc-latam-intl.

Government to undertake "prompt and continuous efforts" towards family reunification, as well as guarantees children the right to a bond hearing before an immigration judge. Although the government has attempted to replace *Flores* by regulation, federal courts have preserved its core protections for decades. In 2024, after HHS promulgated comprehensive regulations governing the Unaccompanied Children ("UC") program, the *Flores* court partially terminated the consent decree as to HHS, finding that the new rule "meets or exceeds" *Flores*'s key standards, while leaving *Flores* in place as to DHS.

48. In 2002, Congress passed the Homeland Security Act ("HSA") which transferred the care and custody of unaccompanied immigrant children from the Immigration and Nationality Service[3] ("INS") to the Office of Refugee Resettlement ("ORR"), housed within the Department of Health and Human Services. ORR is not a security agency; its mission is to "incorporat[e] child welfare values" into the care and placement of unaccompanied immigrant children.

49. Congress further codified and strengthened these protections. The 2008 William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA") requires that (1) DHS transfer unaccompanied children to HHS custody within 72 hours (absent exceptional circumstances), 8 U.S.C. § 1232(b)(3); (2) ORR "promptly place[]" such children "in the least restrictive setting that is in the best interest of the child," *id.* § 1232(c)(2); and (3) with limited exceptions not relevant here, place them in full removal proceedings under 8 U.S.C. § 1229a rather than expedited removal, *id.* § 1232(a)(5)(D).

50. ORR's online guide[4] also contains procedures governing the release of children in its care. The guide provides for ORR to "begin[] the process of finding family members and others

---

[3] The INS is the predecessor agency to ICE.
[4] *ORR Unaccompanied Alien Children Bureau Policy Guide*, ORR (Aug. 8, 2025), https://acf.gov/orr/policy-guidance/unaccompanied-children-bureau-policy-guide.

who may be qualified to care for an unaccompanied alien child as soon as the child enters ORR's care." ORR also has policies and procedures that "require the timely release of children and youth to qualified parents, guardians, relatives or other adults, referred to as 'sponsors.'"

51. In 2024, HHS/ORR issued the Unaccompanied Children Program Foundational Rule—the first comprehensive, binding regulations governing ORR's custody, care, placement, and release of unaccompanied children. 45 C.F.R. part 410 (effective July 1, 2024). The rule formalizes long-standing *Flores*/TVPRA principles: child-welfare decision-making; least-restrictive placement; prompt family reunification with appropriate sponsor vetting; access to counsel and supportive services; and robust grievance, oversight, and monitoring structures. It became effective July 1, 2024.

52. Critically, the law's "least restrictive setting" and "best interests" mandates are not satisfied by mere transfer to ORR; they require prompt reunification or release to a suitable sponsor whenever safe and feasible. Congress charged ORR with making "continuous efforts" toward family placement, and ORR's governing policies prioritize release to a parent, legal guardian, or other qualified adult relative able to provide care and physical custody. *See* 6 U.S.C. § 279(b)(1)(C)–(D); 8 U.S.C. § 1232(c)(2).

53. In other words, the system is designed to avoid exactly what DHS did here: separating a child from a safe placement only to re-institutionalize him. Where a child already resides safely with a caregiver in the community, seizing the child and funneling him into shelter-level custody (or any more restrictive placement) is the opposite of "least restrictive" and serves no best-interest rationale. Similarly, transferring a child to ICE custody rather than returning him to his family, as was recommended and approved, serves no best-interest rationale.

**<u>Legal Background: Protections for Unaccompanied Children Who Turn Eighteen</u>**

54. The 2013 amendment to the Trafficking Victims Protection Reauthorization Act

(TVPRA) furthers the statute's goal by providing procedural safeguards for Unaccompanied Alien Children (UACs) in ORR custody who "age-out" upon turning 18, reflecting a Congressional intent to "continue to protect vulnerable young people past the age of eighteen." *Lopez v. Sessions,* No. 18-cv-4189, 2018 WL 2932726, at *9 (S.D.N.Y. June 12, 2018). Upon introducing the TVPRA in the Senate, Sen. Feinstein stated it "seeks to protect children . . . who have escaped traumatic situations" and "ensure that unaccompanied minors in temporary Federal custody are treated as children and not as criminals." 154 Cong. Rec. S10886 (daily ed. Dec. 10, 2008) (statement of Sen. Feinstein); Am. Pet. ¶ 62. Respondents' treatment of Allan flouts Congressional intent.

55. TVPRA safeguards require ICE to "consider placement in the least restrictive setting after taking into account the alien's danger to self, danger to the community, and risk of flight." 8 U.S.C. § 1232(c)(2)(B). The risk factors must "drive[]" the decision whether to detain or not, which cannot be "subordinate[d]" to factors outside § 1232(c)(2)(B). *Garcia Ramirez v. ICE*, 812 F. Supp. 3d 86, 102 (D.D.C. 2025). After weighing all factors, ICE "must" "consider placing each and every age-out in the least restrictive setting available for that individual . . . and more broadly," "must make a variety of detention alternatives available for age-outs." *Garcia Ramirez v. ICE*, 471 F. Supp. 3d 88, 181–82 (D.D.C. 2020). *See also* Settlement Agreement, *Garcia Ramirez v. DHS*, No. 1:18-cv-508, ECF No. 402-1 (D.D.C. Sept. 1, 2022); *Garcia Ramirez*, 471 Fupp. 3d at 175–82, 191 (finding ICE violated its statutory obligations to make placement determinations for age-outs because it failed to consider the least restrictive setting after taking into account the factors identified in the statute); *Garcia Ramirez v. ICE*, 568 F. Supp. 3d 10, 47 (D.D.C. 2021) (issuing permanent injunction against further violations).

56. In October 2025, ICE adopted a new policy stating that (i) age-outs are subject to

mandatory detention under § 1225(b)(2)(A), and (ii) age-outs must be detained unless they qualify for parole under 8 U.S.C. § 1182(d)(5). *See Garcia Ramirez*, 812 F. Supp. 3d at 94. On a motion to enforce, the *Garcia Ramirez* court enjoined the new policy, finding that it "has led, and would continue to lead, to non-compliant age-out placements, depriving age-outs of the protections Section 1232(c)(2)(B) affords." *Id.* at 111. While the court stated it need not determine whether § 1225(b)(2)(A) ever applied to age-outs, *id.* at 99, it concluded that § 1232(c)(2)(B) "governs the custody of age-outs and overrides Section 1225(b), the more general provision." *Id.* at 103.

**<u>The INA's Custody Statutes</u>**

57. The INA describes three detention authorities that pertain to the majority of detained noncitizens in removal proceedings. First, 8 U.S.C. § 1226 authorizes the detention of noncitizens in standard removal proceedings before an immigration judge. *See* 8 U.S.C. § 1229a; *see also Jennings v. Rodriguez*, 583 U.S. 281, 288 (2018) ("Section 1226(a) sets out the default rule: The Attorney General may issue a warrant for the arrest and detention of [a noncitizen] 'pending a decision on whether the [noncitizen] is to be removed . . . [and] [e]xcept as provided in [1226(c)],' the Attorney General 'may release' [a noncitizen] detained under § 1226(a) 'on … bond'"). Individuals in § 1226(a) detention are entitled to a bond hearing at the outset of their detention, *see* 8 C.F.R. §§ 1003.19(a), 1236.1(d), while noncitizens who have been arrested, charged with, or convicted of certain crimes are subject to mandatory detention, *see* 8 U.S.C. § 1226(c).

58. Second, the INA provides for mandatory detention of noncitizens subject to expedited removal under 8 U.S.C. § 1225(b)(1) and for other recent arrivals who are "seeking admission," described under § 1225(b)(2).

59. Lastly, the INA also provides for detention of noncitizens who have a final administrative order of removal, including individuals in withholding-only proceedings, *see* 8

U.S.C. § 1231(a)–(b).

60. The detention provisions at § 1226(a) and § 1225(b)(2) were enacted as part of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) of 1996, Pub. L. No. 104–208, Div. C, §§ 302–03, 110 Stat. 3009-546, 3009–582 to 3009–583, 3009–585. Section 1226(a) was most recently amended in early 2025 by the Laken Riley Act, Pub. L. No.119-1, 139 Stat. 3 (2025).

61. Following the enactment of the IIRIRA, EOIR drafted new regulations explaining that, in general, people who entered the country without inspection were not considered detained under § 1225 and that they were instead detained under § 1226(a). *See* Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997).

62. As a result, for nearly 30 years, most people who entered without inspection and were placed in removal proceedings received bond hearings, unless their criminal history rendered them ineligible pursuant to 8 U.S.C. § 1226(c). That practice was consistent with many more decades of prior practice, in which noncitizens who were not deemed "arriving" were entitled to a custody hearing before an IJ or other hearing officer. *See* 8 U.S.C. § 1252(a) (1994); *see also* H.R. Rep. No. 104-469, pt. 1, at 229 (1996) (noting that § 1226(a) simply "restates" the detention authority previously found at the prior § 1252(a)).

**DHS and DOJ's Abrupt Policy Change on Bond Eligibility**

63. On July 8, 2025, ICE, "in coordination with" the Department of Justice (DOJ), announced a new policy that rejected the well-established understanding of the statutory framework and reversed decades of practice. The new policy, entitled "Interim Guidance Regarding Detention Authority for Applicants for Admission," claimed that all persons who

entered the United States without inspection were now subject to no-bond detention under § 1225(b)(2)(A). The policy applies regardless of when a person is apprehended and affects those who have resided in the United States for months, years, and even decades.

64. On September 5, 2025, the BIA adopted this same position in a published decision, *Matter of Yajure Hurtado*. There, the Board held that all noncitizens who entered the United States without admission or parole are subject to detention under § 1225(b)(2)(A) and are ineligible for IJ bond hearings.

65. Since Respondents adopted these new policies, federal courts have overwhelmingly rejected their new interpretation of the INA's detention authorities within the jurisdiction of the Second and Third Circuits. *See Zumba v. Bondi*, No. 25-cv-14626, 2025 WL 2753496, at *8 (D.N.J. Sept. 26, 2025) ("Petitioner has the far better argument."); s*ee also Mata Velasquez v. Kurzdorfer*, No. 25-cv-493 (LJV), 2025 WL 1953796 (W.D.N.Y. July 16, 2025); *Lopez Benitez*, No. 25 Civ. 5937, 2025 WL 2371588 (S.D.N.Y. August 8, 2025); *Samb v. Joyce*, No. 25-cv-6373 (DEH), 2025 WL 2398831 (S.D.N.Y. Aug. 19, 2025); S*avane v. Francis*, No. 1:25-cv-6666, 2025 WL 2774452 (S.D.N.Y. Sept. 28, 2025); *J.U. v. Maldonado*, No. 25-CV-04836, 2025 WL 2772765 (E.D.N.Y. Sept. 29, 2025); *Artiga v. Genalo*, No. 25-cv-5208, 2025 WL 2829434 (E.D.N.Y. Oct. 5, 2025); *Hyppolite v. Noem*, No. 25-cv-4304, 2025 WL 2829511 (E.D.N.Y. Oct. 6, 2025); *Tumba Huamani v. Francis*, No. 25-8110, 2025 WL 3079014 (S.D.N.Y. Nov. 4, 2025); *Diallo v. Maldonado*, No. 25-05740, 2025 WL 3158295 (E.D.N.Y. Nov. 12, 2025); *Barco Mercado v. Francis*, No. 25 Civ. 6582, 2025 WL 3295903, at *13–14 (S.D.N.Y. Nov. 26, 2025) (collecting cases).

66. Similarly, dozens of district courts around the country have rejected this interpretation. S*ee, e.g., Rodriguez Vazquez v. Bostock*, --- F. Supp. 3d ---, 2025 WL 2782499, at *1 n.3 (W.D. Wash. Sept. 30, 2025) (citing over 20 district court decisions rejecting the

government's position); *Ochoa Ochoa v. Noem*, No. 25 CV 10865, 2025 WL 2938779, at *5 (N.D. Ill. Oct. 16, 2025) (collecting 20 cases in note 8 and accompanying discussion).

67. Courts have almost uniformly rejected DHS's and DOJ's new interpretation because it defies the plain text of the INA. *See Mugliza Castillo v. Lyons*, No. 25-cv-16219 (MEF), 2025 WL 2940990, at *1 (D.N.J. Oct. 10, 2025) ("But as a matter of plain-text reading, it is § 1226(a) that applies to people situated like the Petitioner, not § 1225(b)(2)(A)."). Section 1226(a) applies by default to all persons "pending a decision on whether the [noncitizen] is to be removed from the United States." 8 U.S.C. § 1226(a). These removal hearings are held under § 1229a, to "decid[e] the inadmissibility or deportability of a[] [noncitizen]." 8 U.S.C. § 1229a(a)(1).

68. The text of § 1226 explicitly applies to people charged as being inadmissible, including those who entered without inspection. *See* 8 U.S.C. § 1226(c)(1)(E). Subparagraph (E)'s reference to such people makes clear that, by default, such people are afforded a bond hearing under subsection (a). As the Rodriguez Vazquez court explained, "[w]hen Congress creates 'specific exceptions' to a statute's applicability, it 'proves' that absent those exceptions, the statute generally applies." *Rodriguez Vazquez,* 779 F. Supp. 3d at 1257 (citing *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 400 (2010)); *see also Gomes v. Hyde*, No. 1:25-cv-11571-JEK, 2025 WL 1869299, at *7 (D. Mass. July 7, 2025); *Lopez-Campos v. Raycraft*, No. 2:25-cv-12486, 2025 WL 2496379, at *8 (E.D. Mich. Aug. 29, 2025).

69. As district courts have found, the statutory bars to a bond hearing for inadmissible noncitizens with specific types of criminal history would all be rendered surplusage if in fact no inadmissible noncitizens were eligible for bond. *See Artiga*, 2025 WL 2829434, at *7; *Hyppolite*, 2025 WL 2829511, at *10.

70. In contrast, § 1225(b) applies to people arriving at U.S. ports of entry or who

recently entered the United States. The statute's entire framework is premised on inspections at the border of people who are "seeking admission" to the United States. 8 U.S.C. § 1225(b)(2)(A). *See Rivera Zumba*, 2025 WL 2753496, at *8. Indeed, the Supreme Court has explained that this mandatory detention scheme applies "at the Nation's borders and ports of entry, where the Government must determine whether a[] [noncitizen] seeking to enter the country is admissible." Jennings, 583 U.S. at 287.

71. Allan is not seeking admission; he has lived in the U.S. for about a decade, since he was a young child. As a beneficiary of SIJS, neither is Allan inadmissible. In general, SIJS waives all relevant grounds of inadmissibility that would otherwise prevent a noncitizen from becoming a lawful permanent resident. Moreover, SIJS beneficiaries are explicitly 'deemed… to have been paroled into the United States for the purpose of this adjustment. 8 U.S.C. § 1255(h)(1). *See Estuardo Xol-Mass v. Francis,* No. 26-CV-00025 (JAV), 2026 WL 457005, at *2 (S.D.N.Y. Feb. 18, 2026).

72. Accordingly, the mandatory detention provision of § 1225(b)(2)(A) does not apply to people like Allan, who have already entered and were residing in the United States at the time they were arrested.

**<u>Detention Without Individualized Review</u>**

73. DHS officers must make an individualized determination of all persons detained under 8 U.S.C. § 1226(a) that takes into consideration whether the person (1) is a "danger to property or persons" and (2) is "likely to appear for any future proceeding." 8 C.F.R. § 1236.1(c)(8).

74. Likewise, when government action affects an individual liberty interest, the Due Process Clause of the Fifth Amendment requires consideration (1) the private interest to be affected, (2) the risk of erroneous deprivation of the procedures used, and (3) the government's

interests, including the burden of any additional procedural safeguards imposed. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Accordingly, courts have held that re-detention absent an individualized determination as to flight risk and dangerousness violates due process. *See*, e.g., *Hyppolite,* 2025 WL 2829511, at *13-15 (holding that ICE's arrest of a noncitizen at his immigration court hearing without an individualized determination of danger and flight risk violated his procedural due process rights); *Chipantiza-Sisalema v. Francis,* No. 25-cv-5528, 2025 WL 1927931, at *3 (S.D.N.Y. July 13, 2025) (holding that ICE's re-detention of the petitioner at her immigration court hearing after she had previously been released on recognizance violated her procedural due process rights); cf. *Arias Gudino v. Lowe,* 785 F.Supp.3d 27, 44-46 (M.D. Pa. 2025) (finding re-detention without notice likely violated procedural due process under *Mathews*).

**Remedies in Immigration Habeas Petitions**

75. The "flexible nature" of habeas relief affords district courts significant discretion over the appropriate remedies for violations of law and the Constitution. *See Rivera Zumba,* 2025 WL 2753496, at *11; *Velasco Lopez v. Decker*, 978 F.3d 842, 855 (2d Cir. 2020). The most appropriate remedy for a due process violation like this one, where a person living peacefully in the community was abruptly detained with no pre-deprivation notice, is release on recognizance without the use of alternatives to detention or other conditions. *See Zumba*, 2025 WL 2753496, at *11 (ordering release and enjoining respondents from re-arresting petitioner under § 1225(b)); *Mata Velasquez v. Kurzdorfer*, No. 25-cv-493 (LJV), 2025 WL 1953796 (W.D.N.Y. July 16, 2025) (ordering release and that petitioner could not be re-detained without a pre-deprivation hearing); *Hyppolite,* 2025 WL 2829511, at *17 (same); *Chipantiza-Sisalema*, at *4 (S.D.N.Y. July 13, 2025) (ordering immediate release); *Munoz Materano v. Arteta*, 2025 WL 2630826, at *20 (S.D.N.Y. Sept. 12, 2025 (same); *Rueda Torres v. Francis*, 25-cv-8408, 2025 WL 3168759, at *6 (S.D.N.Y

Nov. 13, 2025 (same).

76. In the alternative, the habeas court can hold its own custody hearing and determine whether the government can prove by clear and convincing evidence that Allan must remain in custody, or whether he may be released on recognizance, an appropriate bond in light of his ability to pay, or supervised release. S*ee L.G.M. v. LaRocco*, 788 F.Supp.3d 401, 405-07 (E.D.N.Y. 2025) (ordering a bond hearing held by the habeas court, as this would be more efficient than delegating the task to the agency and ensure proper constitutional oversight).

**SIJS Provides a Pathway to Permanent Status for Certain Vulnerable Young People**

77. In 1990, Congress created SIJS to protect vulnerable immigrant children and provide them a pathway to citizenship. Immigration Act of 1990, Pub. L. No. 101-649, § 153, 104 Stat. 4978 (1990) (amending various sections of the Immigration and Nationality Act); Special Immigrant Status, 58 Fed. Reg. 42843, 43844 (Aug. 12, 1993) ("This rule alleviates hardships experienced by some dependents of United States juvenile courts by providing qualified [noncitizens] with the opportunity to apply for special immigrant classification and lawful permanent resident status, with [the] possibility of becoming citizens of the United States in the future."). Since 1990, Congress has amended the INA multiple times to expand the protections of SIJ status, most recently in 2008, through the Trafficking Victims Protection Reauthorization Act, Pub. L. 110-457, § 235(d), 122 Stat. 5044 (2008).

78. To be granted SIJS, young people like Allan must first "satisfy[] a set of rigorous, congressionally defined eligibility criteria." *Osorio-Martinez v. Attorney General of the U.S.*, 893 F.3d 153, 163 (3d Cir. 2018). Specifically, the Immigration and Nationality Act ("INA") provides that those eligible for SIJS designation, as relevant here, are noncitizen individuals under the age of 21 who are present in the United States; who have been declared dependent on a state juvenile court; who cannot be reunified with one or more parents because of abuse, neglect, or

abandonment; and for whom it has been determined that it is not in their best interest to return to their country of origin. 8 U.S.C. § 1101(a)(27)(J); 8 C.F.R. § 204.11(c).

79. Crucially, a noncitizen youth is eligible for SIJ status and may only maintain SIJ status if he or she is "*present* in the United States." 8 U.S.C. § 1101(a)(27)(J) (emphasis added). This requirement makes perfect sense in light of the purpose of the SIJS statute. SIJ status is predicated on a state court finding that the youth cannot be safely reunited with one or more parent(s), nor safely sent back to their country of origin. The design of this program, then, "show[s] a congressional intent to assist a limited group of abused children to remain safely in the country with a means to apply for LPR status." *Garcia v. Holder*, 659 F.3d 1261, 1271 (9th Cir. 2011) (abrogated on other grounds).

80. Youth like Allan can apply for SIJS upon receipt of the aforementioned state court findings. The application process includes submitting a Form I-360 SIJS Petition to USCIS, along with the predicate state court order and other supporting evidence. *See* 8 C.F.R. § 204.11(b). USCIS then considers the application and supporting documentation to determine whether to exercise its statutory "consent function" to approve the petition. *See* 8 U.S.C. § 1101(a)(27)(J)(iii). By exercising its statutory consent function to grant SIJS, the agency recognizes the state court's determinations, including that the child's return to their country of origin would be contrary to their best interests. *Id.*

81. SIJS may be revoked only for what the Secretary of Homeland Security deems "good and sufficient cause." 8 U.S.C. § 1155; 8 C.F.R. § 205.2. According to USCIS regulations, such revocation must be made upon notice to the youth in question, who must be permitted the opportunity to submit evidence in opposition to the revocation and to appeal an adverse decision. *See* 8 C.R.F. § 205.2. Revocation of an approved SIJ petition may only be performed by a USCIS

officer authorized to approve such petition in the first instance. *See* 8 C.F.R. § 205.2(a).

82. The main benefit of SIJS—and indeed, its core purpose—is that it confers on vulnerable young people like Allan the right to seek LPR status while remaining in the United States. *See* 8 U.S.C. § 1255(h). Accordingly, youth with SIJ status must be "provide[d] . . . an opportunity to pursue adjustment of status." *Del Cid, et al., v. Bondi*, No. 3:25-CV-00304, 2025 WL 2985150, at *4 (W.D. Pa. Oct. 23, 2025).

83. To facilitate this process, Congress removed numerous barriers to adjustment of status for SIJS beneficiaries through amendments to the SIJS provisions in 1991 and again in 2008. For example, SIJS youth are "deemed . . . to have been paroled into the United States" for the purposes of adjustment of status. 8 U.S.C. § 1255(h)(1). Further, Congress exempted SIJS youth from many common inadmissibility grounds and created a generous waiver of many of the non-exempted inadmissibility grounds. 8 U.S.C. § 1255(h)(2). And, Congress, explicitly provided that specified grounds for removal "shall not apply to a special immigrant described in section 1101(a)(27)(J) of this title [the SIJ statute] based upon circumstances that existed before the date the [noncitizen] was provided such special immigrant juvenile status." 8 U.S.C. § 1227(c).

84. Although SIJS renders youth eligible to apply for adjustment, they can only do so when a visa is immediately available to them. 8 U.S.C. § 1255(h). However, there is an annual limit on visas available to SIJS beneficiaries. 8 U.S.C. § 1153(b)(4). And since 2016, the number of SIJS beneficiaries has surpassed the supply of available visas for most countries, leaving what has been estimated to be more than 100,000 young people in a backlog, waiting to apply for a green card.

85. Taken together, the structure of the SIJS program—including the requirement that recipients remain in the United States to move forward in the process, the grant of parole for the

purpose of adjustment, and the waiver of grounds of inadmissibility and removability—evinces Congress' intent that SIJ status recipients remain safely in the United States until they can adjust to become LPRs. Because SIJS is an adjustment-of-status pathway pursued from within the United States, removing a SIJ beneficiary before a visa becomes available would effectively nullify the protection Congress created. *See* 8 U.S.C. §§ 1101(a)(27)(J), 1255(h)(1)–(2), 1227(c).

**Deferred Action Gives Meaning to Congress' Intent That SIJS Beneficiaries be Protected**

86. In March 2022, to address the SIJ visa backlog, USCIS announced that all young people granted SIJ status would also be considered for a discretionary grant of deferred action, meaning that they would be protected from deportation while waiting for a visa to become available. In enacting this policy, USCIS acknowledged that "Congress likely did not envision that SIJ petitioners would have to wait years before a visa became available. . . ."[5] Persons granted deferred action are shielded from deportation and are eligible to apply for employment authorization under 8 C.F.R. § 274a,12(c)(14).[6]

87. Importantly, "USCIS has the sole authority to grant and terminate deferred action for noncitizens with SIJS classification."[7] And, generally, USCIS may only terminate deferred action "if the SIJ-classified individual was not eligible at the time of the initial grant of deferred action, the SIJ Form I-360 is revoked, or if they are no longer eligible based on new information." *Id.*

---

[5] USCIS, Policy Alert PA-2022-10, at 1 (Mar. 7, 2022), https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20220307-SIJAndDeferredAction.pdf ("2022 Policy Alert"); *see also* USCIS, Training regarding SIJ Deferred Action Background, at 11–12, https://www.ilrc.org/sites/default/files/2025-09/FOIA%20Results%20on%20SIJS%20Deferred%20Action%20Policy.pdf.

[6] 2022 Policy Alert, at 2.

[7] Solcyré Burga, Young Immigrants Who Have Faced Abuse and Neglect Sue Trump Administration for Exposing Them to Deportation, TIME (July 2025), https://time.com/7303651/immigration-youth-sue-trump-lawsuit-sijs/(reporting that, "[b]eginning in April, [USCIS] began neither approving or denying SIJ status recipients' work permit applications," and only later issued a policy alert ending automatic deferred-action consideration).

88. In June 2025, USCIS rescinded the SIJS deferred action policy, deciding to no longer consider granting deferred action to SIJS youth waiting to apply for a green card.

89. However, this policy change has no impact on SIJS beneficiaries who already received deferred action. *See* USCIS Policy Alert, PA-2025-07, "Special Immigrant Juvenile Classification and Deferred Action" (June 6, 2025), available at: 20250606-SIJDeferredAction.pdf (stating that noncitizen "with current deferred action based on their SIJ classification will generally retain this deferred action . . . until the current validity periods expire.").

90. Deferred action is an act of prosecutorial discretion that defers efforts to deport a noncitizen from the United States for a certain period of time. In the case of SIJS recipients awaiting visas, USCIS granted deferred action for a period of four years. *See id.*

91. Unless and until terminated, a grant of deferred action prevents immigration authorities from physically removing a noncitizen from the United States. *See* USCIS Policy Manual, Vol. 6: Immigrants, Part J: Special Immigration Juveniles, Ch. 4: Adjudication; *Reno v. Am.-Arab Anti-Discrimination Comm*., 525 U.S. 471, 484 (1999) ("*AADC*").

92. Once deferred action is granted, fundamental procedural due process protections attach to the recipient, such as the right to notice and an opportunity to contest the revocation of deferred action. S*ee Maldonado v. Noem*, No. 4:25-CV-2541, 2025 WL 1593133, at *2 (S.D. Tex. June 5, 2025) (finding that Petitioner was "likely to succeed on his Due Process claim" because he was denied "notice, a hearing, or any opportunity to contest the revocation of his deferred action.").

## CLAIMS FOR RELIEF

### COUNT I

### Fifth Amendment: Violation of Procedural Due Process

93. Petitioner repeats and incorporates by reference each allegation contained in the preceding paragraphs.

94. The procedural due process guarantee of the Fifth Amendment requires that individuals be provided notice and an opportunity to be heard before being deprived of liberty or property interests. *Mathews*, 424 U.S. at 332. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690.

95. Under the familiar *Mathews v. Eldridge* test, then, the government's decision to arrest Allan without any notice or an opportunity to respond, and to continue to detain him without any opportunity to meaningfully challenge that detention, clearly violates his procedural due process rights. Further, Respondents neither gave Allan a warning that he would be detained in ICE custody upon his 18th birthday nor the opportunity to contest that detention. The government's decision to arrest Allan without any notice or an opportunity to respond and to continue to detain him without any opportunity to meaningfully challenge that detention, clearly fails *Mathews*.

96. First, Allan has a substantial, legally protectable liberty interest, created by his reliance on his SIJS and deferred action, at stake. *Velasco Lopez v. Decker*, 978 F.3d 842, 851 (2d Cir. 2020) ("the interest in being free from imprisonment" is "the most significant liberty interest there is").

97. Second, the risk of erroneously depriving Allan of that interest is severe. At only 18 years old, he has been separated from his family and community and is missing the opportunity to pursue higher education and training to be an HVAC technician. Despite his best efforts to set himself on a good track and follow the demands of the federal immigration system, he has been thrown into sudden instability. He has been afforded absolutely no process, let alone constitutionally sufficient process, prior to or since this deprivation, making the value of additional process high. *See Eldridge*, 424 U.S. at 343. To protect against the risk of erroneous deprivation,

the government must provide a custody hearing in which it must justify his detention based on a showing of changed circumstances. *See Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1176 (N.D. Cal. 2017) (finding government required to provide prompt hearings to re-detained unaccompanied minors), *aff'd sub nom. Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018).

98. Third, the government's interest in detaining Allan is minimal. On the one hand, the government has no interest in detaining noncitizens—especially children—who cannot be removed and present no flight risk or danger. Prior to his re-detention in 2025, Allan was firmly settled in Texas, surrounded by family. Allan cannot be deported and does not present any flight risk or danger: he has been firmly settled in the United States since the age of 8, has a stable familial life with his mother and siblings, and has no pending criminal cases, charges, or felony history. Allan has learned English fluently and worked hard to graduate one year early from high school. He spent time working as a line cook at a restaurant in Texas and has been self-studying to become an HVAC technician with hopes of enrolling in trade school soon. He remained in ORR custody for close to eight months without any disciplinary issues, yet was transferred to ICE custody rather than being released to his mother, a previously approved sponsor. On the other hand, additional process would entail little to no burden on the government. *See Mathews*, 424 U.S. at 347. Indeed, "additional procedural safeguards" would not "undercut [the government's] interests" in ensuing that Allan comply with any requirements placed on him. *Black v. Decker*, 103 F.4th 133, 153 (2d Cir. 2024). And "additional resources that the government will need to expend to justify continued detention at bond hearings will be minimal—and will likely be outweighed by costs saved by reducing unnecessary detention." *Id.* at 154–55. Further, a core function of ORR pursuant to its statutory mandate is to routinely make determinations about

whether unaccompanied minors' detention is necessary or if they can be released to an adult in the community. *See Saravia*, 905 F.3d at 1140 (discussing ORR's obligations to make such custody determinations).

99. Allan's transfer to ICE detention from ORR and his continued detention without an opportunity to be heard violates his procedural due process rights under the Fifth Amendment of the Constitution. Allan's transfer to ICE detention from ORR without an opportunity to be heard therefore violates his procedural due process rights under the Fifth Amendment of the Constitution.

**COUNT II**

**Fifth Amendment: Violation of Substantive Due Process**

100. Petitioner repeats and incorporates by reference each and every allegation contained in the preceding paragraphs.

101. The Supreme Court has long recognized that noncitizens physically present in the United States are entitled to due process protections, regardless of their immigration status. *Zadvydas*, 533 U.S. at 693; *Mathews v. Diaz*, 426 U.S. 67, 77 (1976.). Substantive due process requires that there be a reasonable relation between an individual's detention and the government's purported interests in that detention. S*ee Jackson v. Indiana,* 406 U.S. 715, 738 (1972); *Brown v. Taylor*, 911 F.3d 235, 243 (5th Cir. 2018). Because Allan's removal is not reasonably foreseeable and there is no other justification for his detention, his detention is in violation of the substantive due process protections of the Fifth Amendment.

102. Here, the government cannot remove Allan from the United States for at least three reasons. First, Allan has a valid grant of deferred action, which precludes his removal. His grant of deferred action remains valid until May 12, 2026.

103. Second, Allan has a procedural due process right under the INA and DHS regulations not to have his SIJS revoked without notice and an opportunity to submit evidence in

opposition to the revocation and to appeal an adverse decision. 8 U.S.C. § 1155; 8 C.F.R. § 205.2. Because the INA requires that a youth be present in the United States to have SIJS, 8 U.S.C. § 1101(a)(27)(J), forced removal from the United States would constitute a de facto revocation of SIJS. *See* 8 U.S.C. § 1101(a)(27)(J). Therefore, removing Allan from the United States (regardless of his deferred action grant) would be unlawful.

104. Third, removing Allan (regardless of his deferred action grant) would contravene the very purpose of the SIJS statute. As discussed supra, the core purpose of SIJS protection is to provide beneficiaries like Allan with a means to adjust their status to become a lawful permanent resident from within the United States. Because physical presence in the United States is required to adjust status pursuant to SIJS, Allan must remain present in the United States to avail himself of that process. *See* 8 U.S.C. § 1101(a)(27)(J). Allowing Allan to be removed from the United States after he has already been granted SIJS would thus eviscerate Congress' goal in creating the status in the first place.

105. For all of the foregoing reasons, the government cannot lawfully remove Allan from the United States. Accordingly, Allan's detention violates his substantive due process rights under the Fifth Amendment.

## COUNT III

## Violation of the William Wilberforce Trafficking Victims Protection Reauthorization Act (TVPRA) and the Immigration and Nationality Act (INA)

106. Petitioner incorporates by reference the allegations in the preceding paragraphs.

107. Under the TVPRA, 8 U.S.C. § 1232(c)(2)(B), U.S. Immigration and Customs Enforcement ("ICE") is required to consider the "least restrictive setting" for noncitizens transitioning from the custody of the Office of Refugee Resettlement ("ORR") to adult detention upon their eighteenth birthday ("age-outs"). This determination must be "driven" by an

individualized assessment of the individual's danger to self, danger to the community, and risk of flight. *Garcia Ramirez v. ICE*, 812 F. Supp. 3d 86, 102 (D.D.C. 2025).

108. Respondents have failed to comply with these statutory requirements in the case of Allan. Instead of the planned release on recognizance to Allan's mother, Respondents transferred Allan to an adult detention facility.

109. Upon information and belief, Respondents failed to properly document or consider the least restrictive alternative for Allan as required by the 2022 *Garcia Ramirez* Settlement Agreement and the permanent injunction issued in that litigation. *See Garcia Ramirez v. ICE*, 568 F. Supp. 3d 10, 47 (D.D.C. 2021).

110. The mandatory detention provision at 8 U.S.C. § 1225(b)(2) does not apply to all noncitizens residing in the United States who are subject to the grounds of inadmissibility. As relevant here, it does not apply to those who previously entered the country and have been residing in the United States, such as Allan.

111. By applying a presumption of detention or relying on the mandatory detention provision of 8 U.S.C. § 1225(b)(2) to justify Allan's transfer, Respondents have violated the TVPRA and the INA. This application of the law unlawfully mandates Petitioner's continued detention without the individualized, statutory review to which he is entitled.

**COUNT IV**

**Violation of the Administrative Procedure Act, 5 U.S.C. §§ 702, 706 (Arbitrary and Capricious)**

112. Petitioner incorporates by reference the allegations of fact set forth in preceding paragraphs.

113. Under the Administrative Procedure Act, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with the law," that is "contrary to constitutional right [or] power," or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

***Placement of Allan in ICE Custody Violates the APA***

114. Additionally, and independently, Respondents acted arbitrarily, capriciously, and contrary to law by disregarding the controlling child-welfare framework governing custody and release of immigrant children. Congress, through the HSA and the TVPRA, requires that unaccompanied children be maintained in the least restrictive setting appropriate to their needs and that the government undertake prompt and continuous efforts toward placement with qualified family sponsors. *See* 6 U.S.C. § 279(b)(1)(C)–(D); 8 U.S.C. § 1232(c)(2). DHS's own juvenile regulation likewise requires prompt transfer and child-appropriate custody decisions. *See* 8 C.F.R. § 236.3 (including transfer to HHS/ORR within 72 hours). And the *Flores* Settlement Agreement requires release "without unnecessary delay" and prioritizes placement in the community.

115. Respondents' decision to detain Petitioner flies in the face of the statutory regime's contemplation that minors remain in the least restrictive setting.

116. By seizing a then seventeen-year-old from an existing, stable family home in the Texas—where he had been living with relatives—and funneling him toward institutional custody (first ORR and now ICE) while he waits to apply for adjustment of status, Respondents ignored an "important aspect of the problem," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), inverted the statutory sequence that favors family placement over institutional care, and failed to explain why less-restrictive alternatives (further check-ins or immediate reunification with the identified family sponsor) were inadequate. Respondents were obligated to preserve (or at least assess and document) the already-available relative sponsor

and to coordinate release consistent with § 1232(c)(2)–(3) and *Flores*. Their failure to perform that analysis renders the decision unreasoned. *See Judulang v. Holder*, 565 U.S. 42, 53 (2011).

**COUNT V**

**RELEASE PENDING ADJUDICATION**

117. Petitioner incorporates by reference the allegations of fact set forth in preceding paragraphs.

118. Pursuant to *Mapp v. Reno*, this Court has the "inherent authority" to set bail pending the adjudication of a habeas petition when the petition has raised (1) substantial claims and (2) presents extraordinary circumstances that (3) "make the grant of bail necessary to make the habeas remedy effective," 241 F.3d 221, 226 (2d Cir. 2001).

119. Allan asserts numerous substantial constitutional and statutory claims challenging his detention.

120. Allan has also demonstrated multiple extraordinary circumstances which make him eligible for bail, including his young age, his SIJ and deferred action status, and the trauma of family separation that may be nearly impossible to remedy post-detention.

121. He respectfully requests immediate release pending adjudication of the instant petition.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Petitioner requests that this Court:

a. Assume jurisdiction over this matter;

b. Order that Petitioner shall not be transferred outside the Southern District of New York, or in the alternative, the New York-New Jersey area, while this habeas petition is pending;

c. Issue an Order to Show Cause ordering Respondents to show cause why this Petition should not be granted within three days;

d. Issue a Writ of Habeas Corpus requiring that Respondents immediately release Petitioner without conditions of supervision or alternatives to detention; or, in the alternative, that this Court hold a bond hearing within seven days at which the government bears the burden to justify that his continued detention is necessary by clear and convincing evidence;

e. Declare that Petitioner's arrest and ongoing detention are unlawful;

f. Award reasonable attorney's fees and costs pursuant to the Equal Access to Justice Act, 5 U.S.C. § 504 and 28 U.S.C. § 2412; and

g. Grant any other and further relief that this Court deems just and proper.

Dated this 13th day of April 2026

Respectfully Submitted,

/s/ Beth D. Baltimore
Beth D. Baltimore
Ellinor Rutkey
THE DOOR'S LEGAL SERVICES CENTER
121 Avenue of the Americas, 3rd Floor
New York, New York 10013
917-701-9130
bbaltimore@door.org

*Attorneys for Petitioner*

**VERIFICATION PURSUANT TO 28 U.S.C. § 2242**

I am submitting this verification on behalf of the Petitioner because I am one of the Petitioner's attorneys. I have discussed with the Petitioner's legal team the events described in this Petition. On the basis of those discussions, on information and belief, I hereby verify that the factual statements made in this Petition and Complaint are true and correct to the best of my knowledge.

Dated this 13th day of April 2026.

Jocabed Rosario
Jocabed Rosario, Esq.